**CENTRAL OKLAHOMA PRESERVATION ALLIANCE, INCORPORATED, a Non-Profit Corporation, Plaintiff,**

**v.**

**OKLAHOMA CITY URBAN RENEWAL AUTHORITY, the United States Department of Housing and Urban Development, Patricia Harris, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development, Thomas J. Armstrong, Individually and in his official capacity as Regional Administrator of Region VI of the United States Department of Housing and Urban Development, and Tompkins & Co., Defendants.**

**No. CIV-78-01005-T.**

United States District Court, W. D. Oklahoma.

Jan. 24, 1979.

Kent S. Johnson, Merton M. Bulla and Carrie S. Hulett of Bulla, Horning & Johnson, Oklahoma City, Okl., Leonard Ripps of Feuer, Flossic & Rich, Denver, Colo., for plaintiff.

Dan Batchelor and Jerry L. Salyer, Oklahoma City, Okl., for Oklahoma City Urban Renewal Authority and Tompkins & Co.

Larry D. Patton, U. S. Atty., and David A. Poarch, Asst. U. S. Atty., Oklahoma City, Okl., for HUD, Harris and Armstrong.

MEMORANDUM OPINION AND ORDER

RALPH G. THOMPSON, District Judge.

This action for declaratory and injunctive relief was heard on October 27, 1978, Leonard Ripps of Denver, Colorado and Kent S. Johnson and Carrie S. Hulett of Bulla, Horning & Johnson of Oklahoma City appearing for the Plaintiff, Central Oklahoma Preservation Alliance, Incorporated, a nonprofit corporation. Defendant Oklahoma City Urban Renewal Authority and Tompkins & Co. appeared through James Dan Batchelor and Jerry L. Salyer of Oklahoma City and the United States Department of Housing and Urban Development and Patricia Harris as Secretary thereof and

Thomas J. Armstrong as regional administrator thereof appeared by Larry D. Patton, United States Attorney for the Western District of Oklahoma. (Defendants Harris and Armstrong were dismissed in their individual capacities and remain only in their respective official capacities.) Having considered the testimony of witnesses, stipulated facts, other documentary evidence, and the proposed findings of fact and conclusions of law from the respective parties together with their briefs and arguments of counsel, the Court now enters this Memorandum Opinion and Order which shall constitute its findings of fact and conclusions of law.

The Plaintiff, Central Oklahoma Preservation Alliance, Incorporated, a nonprofit corporation (referred to in this opinion as COPA), commenced this action on September 19, 1978, for a preliminary and permanent injunction against the Defendants, the Oklahoma City Urban Renewal Authority (referred to in this opinion as OCURA), the United States Department of Housing and Urban Development (referred to in this opinion as HUD), and Tompkins & Co. (referred to in this opinion as Demolition Contractor) to prevent demolition of a twelve story structure known as the Hales Building. The complaint was filed pursuant to 5 U.S.C. § 701 alleging jurisdiction under 28 U.S.C. § 1331 by reason of the failure of Defendants to comply with obligations under the National Environmental Policy Act (referred to in this opinion as NEPA), 42 U.S.C. § 4321, *et seq.*, the National Historic Preservation Act (referred to in this opinion as NHPA), 16 U.S.C. § 470, *et seq.*, Executive Order 11593, HUD Handbook 1390.1 (Federal Register Vol. 38, No. 137, July 18, 1973) (containing policies, responsibilities and procedures for protection and enforcement of environmental quality), and regulations of the Advisory Council on Historic Preservation, 36 C.F.R. § 800.1, *et seq.*

Defendant HUD's certifications of the record of its environmental and historical reviews and clearances were promptly filed in the case. On October 27, 1978, the Court heard the Plaintiff's application for a preliminary injunction. By a subsequent written stipulation, parties agreed that the hearing may be treated as the hearing on the merits, and the Court concurs.

Plaintiff is a nonprofit organization which was incorporated in June of 1978. Its members are interested in the preservation of historic structures. By way of background, Plaintiff COPA seeks to enjoin the Defendants OCURA and HUD from proceeding with the scheduled demolition of the structure known as the Hales Building, which is located in a four-square block redevelopment site, commonly referred to as the "Galleria" project. The Galleria area was added as a major amendment to Oklahoma City's original Central Business District renewal project pursuant to a major amendatory application filed by OCURA with HUD in June of 1972. HUD completed its environmental review and clearance of this amendatory (known as the Fifth Amendatory) on June 25, 1973, and executed the amended Loan and Grant Contract on January 17, 1974. Shortly thereafter, the environmental assessment was reviewed by HUD and reaffirmed on March 6, 1974. A subsequent major amendatory to the project (designated the Seventh Amendatory) was given an environmental clearance by HUD on July 29, 1977, and the amended Loan and Grant Contract executed November 30, 1977.

The Hales Building is not now (and never has been) listed on or nominated for listing on the National Register of Historic Places. This building was originally designated for removal in the Master Plan for redevelopment of Oklahoma City's Central Business District which was completed in December, 1964. Throughout the series of public hearings relating to the Master Plan in the mid-1960's, the approval of the first phase of the downtown renewal plan in 1968, the approval of the Galleria project itself in 1973, and the later approval of the downtown housing plan in 1977, acquisition and removal of the Hales Building was contemplated and authorized. In the various historical reviews from 1973 through 1977, neither OCURA, nor HUD, nor the State Historic Preservation Officers found any evi-

dence of special historical merit in the Hales Building. The claims of historical significance for the Hales Building arise from the initial meetings of members of the Plaintiff organization in early 1978. The answer of both HUD and OCURA to these claims was that the Hales Building did not meet eligibility requirements for listing on the National Register of Historic Places. Subsequently, in response to COPA's efforts, the State Historic Preservation Officer held a hearing (unrelated to this action) to consider the eligibility of the Hales Building for listing on the National Register of Historic Places and to determine whether the building should be nominated for listing. Both the Plaintiff COPA and the Defendant OCURA attended the hearing on August 10, 1978, and presented evidence. On August 15, 1978, the State Historic Preservation Officer determined that nothing new was brought out at the hearing, the Hales Building did not justify nomination to the National Register of Historic Places, and no further efforts in that direction would be made.

Immediately thereafter, the U.S. Department of Interior (which includes the office of the Keeper of the National Register) advised HUD in writing that it should follow Advisory Council procedures with regard to the Hales Building. HUD replied to the Department of Interior by letter dated August 28, 1978, advising the Interior Department that the requirements of 36 C.F.R. § 800.1, *et seq.*, had been followed as recently as one year ago in connection with a major amendatory to the renewal project. In addition, the letter advised Interior that HUD had again consulted with the State Historic Preservation Officer following his determination of August 15, reaffirming that the Hales Building was not eligible for inclusion in the National Register. The letter also advised that there was no basis for HUD's intervention in the Oklahoma City Urban Renewal Authority's project action in carrying out the approved Urban Renewal Plan at this point in time.

On September 7, 1978, the Keeper of the National Register of Historic Places, Department of Interior, issued a determination that the Hales Building was eligible for listing on the National Register. Pursuant to the amended Department of Interior regulations, 36 C.F.R. § 63.4(c), effective September 21, 1977, the Keeper acted without any request from HUD or the State Historic Preservation Officer. HUD received notification of the opinion of September 8, 1978.

Shortly thereafter this action was commenced.

The case presents three principal issues, along with several subsidiary questions, for decision:

1. Were the historical and environmental reviews and clearances by HUD performed in accord with applicable law and regulations?
2. Does the unilateral determination by the Keeper of the National Register that the Hales Building is eligible for listing on the register, create, in and of itself, an obligation to follow the Advisory Council procedures for comment and review?
3. If the assessments were timely and proper, is there a duty to reassess at this time?

The Plaintiff's complaint presents a broad challenge to HUD's compliance with NEPA, NHPA, Executive Order 11593, and HUD Handbook 1390.1 in granting its environmental clearances and approvals with respect to OCURA's amendatory applications in connection with its Central Business District Urban Renewal Project. The primary assertion of the Plaintiff is that HUD has improperly failed and refused to invoke the procedures for comment and review by the Advisory Council on Historic Preservation with regard to the Hales Building. See 36 C.F.R. § 800.1, *et seq.*

The first issue, i. e., the challenge to HUD's environmental clearances and amendatory approvals, requires judicial review of the full administrative record that was before HUD at the time the challenged actions were taken. *Cooperative Services, Inc. v. United States Department of Housing and Urban Development*, 183 U.S.App.

D.C. 344, 562 F.2d 1292 (1977). The general rule requiring judicial review of agency action on the administrative record applies not only to proceedings involving formal evidentiary hearings, but also to informal agency decisions on a non-evidentiary type record. *Doraiswamy v. Secretary of Labor,* 180 U.S.App.D.C. 360, 555 F.2d 832 (1976). In the instant case, the certified record consists of the Loan and Grant Contract for the project with the various amendments evidencing HUD's approval, HUD's environmental clearances and findings, and a massive amount of documentation considered by HUD in connection with its approval. HUD is not required to develop a "formal" reviewable administrative record with regard to such determinations. *First National Bank of Chicago v. Richardson,* 484 F.2d 1369, 1381 (7th Cir. 1973); *Scherr v. Volpe,* 466 F.2d 1027, 1032 (7th Cir. 1972). The appropriateness of review on the record is not challenged by Plaintiff.

The original project application for the Central Business District No. 1–A Urban Renewal Plan was approved by HUD on December 20, 1967, and a Loan and Grant Contract executed on March 21, 1968. At that time there were no properties included in the original project area listed on the National Register of Historic Places and the National Environmental Policy Act had not been passed.

Subsequently, five amendatory applications were filed and approved with respect to the project. Two were major amendatory applications and three applications involved only funding increases. There were also three contract amendments (numbered first, second and eighth) which incorporated legal provisions mandated by Congress or corrected errors in the Loan and Grant Contract.

All five amendatory applications were subjected to the A–95 review process[1] and the clearance with the State Historic Preservation Officer that the process requires. For the five amendatory applications, the respective dates for State Clearing House approvals and amendatory contract dates are as follows:

| Amendatory | State Clearing House Approval Date | Contract Amendatory Date |
|---|---|---|
| Third (additional funds only) | June 21, 1971 | September 22, 1971 |
| Fourth (additional funds only) | September 5, 1972 | June 21, 1973 |
| Fifth (Galleria Area) | June 1, 1972 | January 17, 1974 |
| Sixth (additional funds only) | December 28, 1973 | April 18, 1974 |
| Seventh (Downtown Housing) | May 9, 1975 | November 30, 1977 |

As required by HUD Circular 1390.1, Environmental Assessments and Clearances were processed and prepared with respect to the Fifth (Galleria area) and Seventh (Downtown Housing) Amendatories. With respect to the Fifth Amendatory, a special environmental clearance was approved on June 25, 1973.[2] Shortly after the execution

1. Pursuant to the Intergovernmental Cooperation Act of 1968, the President directed the Office of Management and Budget to establish a procedure for the review of federally assisted programs in the maze of federal legal and regulatory requirements. Accordingly, the Office of Management and Budget issued Circular No. A–95 on July 24, 1969, which established a project notification and review system to insure that comments and views of state and local agencies which are authorized to develop and enforce environmental standards would be obtained prior to project approvals. Specifically, all applications or amended applications for federal financial assistance for urban renewal projects are subject to the A–95 review process. In this process, project applications are reviewed by the State Historic Preservation Officer to determine whether historic properties will be affected by the project.

2. Supporting documentation contained in the record includes the following:

ECO–3 form dated June 21, 1973.

Report of I.M. Pei on the Central Business District General Neighborhood Renewal Plan, Okla. R–26 (GN) completed in 1964.

Transportation Elements of the General Neighborhood Renewal Plan, Barton-Aschman, 1965.

Appraisal of the Parking Program and Transportation Elements for the General Neighborhood Renewal Plan.

Land Utilization and Marketability Study for the CBD GNRP R–26 (Morton-Hoffman and Company, December, 1964).

Circulation and Parking Elements of the Urban Renewal Project 1–A (An Analysis Prepared for the Oklahoma City Urban Renewal Authority) Barton-Aschman.

of the Fifth Amendatory Contract on January 17, 1974, this assessment was reviewed in the light of additional information furnished to HUD and was reaffirmed on March 6, 1974.[3]

HUD's assessment and finding regarding the Fifth Amendatory Application is supported by thirty (30) volumes of documents constituting the record for review. These volumes and documents consist largely of work resulting from two major planning studies funded by HUD, designated respectively as Project No. Okla. R–26 (GN) and Project No. Okla. R–26 (GN)(B). The first group of studies took place during the period of 1962 through 1966 and were conducted by the following consortium:

Urban Design and Planning—I. M. Pei and Partners

Traffic Circulation and Parking—Barton-Aschman, Associates

Land Utilization and Marketability—Morton Hoffman and Company

Engineering—Carter and Burgess

The initial survey and planning studies were completed at a cost of $887,928.00.

The second major study was conducted during the period 1972 through 1975, and this study was an update and expansion of the early study. It was undertaken by the following consortium:

Urban Design and Management—Gruen Associates, Inc.

Transportation—A. M. Voorhees and Associates, Inc.

Economics—Larry Smith and Co., Inc.

Engineering and Mapping—McCaleb Engineering Co.

Engineering—Utilities—Grossman and Keith Engineering Co.

Although the cost is not disclosed by the record, the documentation contained in the record demonstrates a major study effort.

The project and its proposed actions are described in the Fifth Amendatory Application, Urban Renewal Project Okla. R–30.

Extensive portions of the record are devoted to the description and inventory of the existing environment and the identification of adverse environmental conditions and trends. The physical environment includes assessments of land uses, transportation, and structural conditions as well as topography, climate, urban design, and utilities. The assessment of the existing social-economic environment includes population and employment, economic characteristics, minority group considerations and relocation. Additional evaluation of the economic environment is contained in five volumes of studies prepared by Larry Smith and Company, Inc. Especially helpful discussions of the adverse environmental trends and conditions are found in the Morton-Hoffman Land Utilization and Marketability Study and in the Gruen Associates, Inc., Technical Report I, Inventory Analysis.

The Fifth Amendatory Application deals with the question of identification of structures of sufficient historical and architectural significance to qualify for listing on

Land Utilization and Marketability Study for Project 1–A of the CBD R–30 (Morton-Hoffman and Company, 1966).

Oklahoma City Area Transportation Study (Wilbur Smith, 1965).

Public Transportation Program for Oklahoma City (Wilbur Smith, 1966).

Central Core Traffic Plan jointly prepared by the Oklahoma City Planning Department, Department of Traffic Control, and the Oklahoma City Urban Renewal Authority Planning Department, adopted by the City Council of Oklahoma City in 1972.

Oklahoma City Area Transportation Study Update (ACOG, Oklahoma State Highway Department, 1974).

Loan and Grant Application Parts I & II Project Okla. R–30 submitted August 25, 1967.

Amendatory Application for Loan and Grant Central Business District 1–A Project Okla. R–30, submitted May 31, 1972.

3. Additional documents contained in the record includes:

Gruen Associates, Inc.; Technical Report No. 1, Inventory Analysis, October 1972.

Gruen Associates, Inc.; Oklahoma City Expanded CBD–GNRP Monthly Progress Reports 1–10.

Larry Smith & Company, Inc.; Economic Reports, 1973.

Alan M. Voorhees & Associates, Inc.; Central City Transportation Plan, 1973.

Letter to HUD dated February 28, 1974.

the National Register. In the Project Area Report which describes existing environmental conditions, the following statements are found:

> F. Historical or Architectural Value. Within the expanded area, there are no sites or building listed on the National Register. The only structure of historical significance is the Colcord Building, 15 North Robinson. This structure received in 1970 a Design Excellence Award from the Oklahoma City Arts Council for the lobby of the building. The Colcord Building is scheduled for conservation due to its historical and architectural significance.
>
> I. Criteria for Determination of Historic or Architectural Value. In a telephone conversation on May 8, 1972, Mr. Mike Bureman, Director of Historical Sites Division of the State's Historical Society, indicated that there are no districts, sites, structures, or buildings, in downtown Oklahoma City listed on the National Register.

Technical Report No. I, Inventory Analysis, prepared by Gruen Associates, Inc. tentatively identified some structures which had historically unique characteristics. The Hales Building was not one of these. The report states:

> There are a few remaining very fine old structures that should be preserved in Oklahoma City; however, the majority of the earliest wood structures have already disappeared. With the exception of the East Reno area, it appears that there is no candidate area within the GNRP (the area of the study) area for a historical district.

The Fifth Amendatory Application and supporting documents contained in the record demonstrate that the primary thrust of the Amendatory project actions would be to remedy, reverse, and mitigate the existing adverse environmental trends and conditions.

Pursuant to the Urban Renewal Plan, the primary land uses remain the same. There is no conversion of land use, such as rural to urban, farm land to residential, or undeveloped land to lakes, airports or expressways. The project changes the acreage devoted to nonresidential uses from 96.087 to 99.911.

An examination of project alternatives is also contained in these studies.

In making its environmental assessment, HUD attested to its own efforts to verify the completeness and accuracy of the information contained in the Fifth Amendatory Application:

> Site inspections have been made, inquiries conducted, local approvals obtained as well as applicable state agency approvals.
>
> The accuracy and completeness of the information supplied by the applicant has been verified by site inspections, information supplied by local agencies, required local approvals and public hearings, consultation with and approval from state and area wide planning agencies and information supplied to this office in the Pei Plan, GN26, and the application.

The HUD assessments identify the principal long-term impact of the project as being the reduction and reversal of the adverse environmental conditions and trends:

> The acquisition and clearance of the six-block area is considered vital to the future of the downtown area as visualized by the Pei Plan which was concluded some time ago. The GNRP Study, presently underway, concludes the redevelopment, as planned, is necessary to restore the area to viable condition. Ninety percent of the present buildup is substandard and/or functionally obsolete.
>
> The entire project has been planned to reduce adverse environmental influences and result in viable, pleasant downtown.

The primary adverse impacts of the project were identified as being short term in nature:

> Interim problems during the demolition and construction phases will be typical, but unavoidable.
>
> Beneficial environmental impacts will tend to be long-range lasting effects while adverse effects will be of short duration, such as: noise, dust, interruption of traffic flow, and general unpleas-

antries that normally result from the removal of obsolete, sometimes structurally unsound structures, the replacement of public utilities, updating of traffic patterns and signalization.

HUD determined that the short-term adverse effects were unavoidable by use of alternative plans or designs:

> The project is in the Central Business District and no alternatives were possible (to avoid the short-term adverse environmental impacts).
>
> Short-term adverse effects, as previously discussed, are unavoidable and can generally be classified as "progress pains."

The Special Environmental Clearance Worksheet used by HUD in connection with the June 25, 1973 clearance requests a discussion, where appropriate, of the impact on property listed on or being considered for nomination to the National Register of Historic Places. At that time, there were no properties in this category. However, subsequent to the June 25, 1973 assessment, the old Federal Post Office Building (located outside the project boundaries) was nominated for inclusion on the register in August of 1973 and approved for inclusion on August 30, 1974. The Special Environmental Clearance Worksheet, dated March 5, 1974, determined that there was a property listed on or nominated to the National Register in the vicinity of the proposed action and also determined that the proposed HUD action (approval of the project) would have no effect on such property. This information was independently ascertained by HUD; it was not contained in the application or other documents submitted.

Based on its determinations that the primary long-term impact of the project was the reversal or mitigation of existing adverse environmental trends and conditions, and that the principal adverse effects of the project were short-term in nature and unavoidable, HUD made its finding on June 25, 1973, that: "There is no significant environmental impact beyond that contemplated by and considered acceptable under HUD environmental policies and standards" and reaffirmed this finding on March 6, 1974.

The Seventh (Downtown Housing) Amendatory was reviewed and given a special environmental clearance on July 29, 1977.[4]

HUD's assessment regarding the Seventh Amendatory is also backed by extensive documentation contained in the record. See especially the document entitled Environmental Assessment, Downtown Housing, Oklahoma City, which focuses in one volume the relevant environmental considerations.

The Seventh Amendatory Application for the downtown housing area addressed the question of architectural and historical significance:

> F. Historical or Architectural Value. Within the expanded area, there are no sites or buildings listed on the National Register. It can be noted that *the only structures of historical significance* in the entire Oklahoma City Central Business District are the Colcord Building, 15 North Robinson, and the old Post Office, Northwest Third and Robinson. The Colcord Building received in 1970 a Design Excellence Award from the Oklahoma City Arts Counsel for the lobby of the building. The Colcord Building is scheduled for conservation due to its historical and architectural significance.

The Colcord Building was nominated for listing on the register on May 14, 1976, and approved for listing on November 7, 1976. The application also states:

> H. *Criteria for Determination of Historic or Architectural Value.* Mr. Howard Meredith of the Historical Preservation Office, Oklahoma State Historical Socie-

4. Supporting documentation contained in the record includes:

Amendatory Application for Loan and Grant, Parts I and II, dated December 7, 1976.

Letter from Dr. Harry L. Deupree, State Historic Preservation Officer dated July 5, 1977.

Environmental Assessment—Downtown Housing, Oklahoma City.

Environmental Impact Assessment of the Proposed Oklahoma City Central City Plan by Gruen Associates.

ty, indicated on June 28, 1976, that there are two structures downtown listed on the National Register. They are the Colcord Building located at 15 North Robinson and the old Post Office Building at Northwest Third and Robinson. Those structures will not be affected by the proposed housing project.

Since there were no historic properties in the housing area (or its immediate vicinity), the document entitled Environmental Assessment, Downtown Housing, Oklahoma City determined that the question of the effect of the housing project on historic properties was not applicable. The reprint of the survey from Technical Report No. 1 contained in the document entitled Environmental Impact Assessment of the proposed Oklahoma City Central City Plan, revealed no structures in the housing area possessing historically unique characteristics. The record also includes a letter from the State Historic Preservation Officer, Harry L. Deupree, M.D., dated July 5, 1977, reaffirming the 1975 clearance by Mr. George H. Shirk, as previous State Historic Preservation Officer, regarding the Central Business District Urban Renewal Project. The letter states:

> This office remains in agreement with Mr. Shirk's opinion and finds this project will have no effect on any property listed in either the National Register of Historic Places or the Oklahoma Survey Inventory.

HUD's Special Environmental Clearance Worksheet, dated July 7, 1977, determined that there were no historic properties on the housing site or its vicinity, and cites additional confirmation by letter dated June 30, obtained by HUD from the Oklahoma Heritage Association.

The assessment certifies completion of A-95 Review Requirements, HUD verification of accuracy and completeness of the information by site inspection, and the necessary local approvals and public hearings. HUD identified short-term and long-term impacts as follows:

> Short-term noise and dust due to demolition and construction. Long-term aspects involve the provision of downtown housing.

HUD weighed the beneficial and adverse environmental impacts:

> Beneficial outweighs the adverse by providing housing for people in the downtown area near their places of employment.

HUD also determined:

> The project when fully developed and occupied should not create any significant impact upon school facilities, police and fire protection, health services and park and recreation facilities. Project is within National, State and local goals.

In support of its findings HUD concluded:

> Two different size projects and a "no build" alternative have been considered. Neither size project has significant environmental impact.

The environmental clearance on the Seventh Amendatory was approved by HUD on July 29, 1977.

Plaintiff COPA broadly attacks HUD's decision to prepare a special environmental clearance for the Galleria area in connection with the Fifth Amendatory Application and challenges HUD's finding that "there is no significant environmental impact beyond that contemplated by and considered acceptable under HUD environmental policies and standards." A similar allegation is made with respect to the Seventh Amendatory.

Numerous cases have considered the role of the judiciary in examining federal agencies' determinations pursuant to NEPA. In *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the United States Supreme Court said that:

> Neither the statute (NEPA) nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. (Citations omitted.) The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the

choice of the action to be taken." (Citations omitted.) 427 U.S. 390 at 410, n. 21, 96 S.Ct. at 2730, n. 21.

The Court is to determine whether the Federal Agency reached its decision after a full, good-faith consideration and balancing of environmental factors, and whether the decision gave insufficient weight to environmental values. *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir. 1976); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973); *Inman Park Restoration v. Urban Mass Transportation Administration*, 414 F.Supp. 99 (N.D.Ga.1976). Under NEPA, an unreasonable disregard of environmental considerations is not permitted *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).

A concise statement by the Federal Agency is sufficient to support a finding of no significant environmental impact if it is grounded upon supporting evidence. *Hanly v. Mitchell*, 460 F.2d 640, 646 (2nd Cir. 1972), cert. den. 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Nucleus of Chicago Homeowners Association v. Lynn*, 524 F.2d 225 (7th Cir. 1975). Such supporting evidence and studies need not be physically attached as long as they are otherwise available. *Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060 (8th Cir. 1977).

The applicable environmental and historic laws and regulations are incorporated in HUD Handbook 1390.1, which was published after consultation with and review by the Council of Environmental Quality. This includes the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et seq.* (1970); The National Historic Preservation Act of 1966, 16 U.S.C. § 470, *et seq.* (1970); Executive Order 11593; and Advisory Council on Historic Preservation, Procedures for Compliance, 36 C.F.R. § 800.1, *et seq.* (See HUD Handbook 1390.1, ¶ 1.b, g; ¶ 5.a(6); Appendix I., L., M.).

Under the HUD regulations a three-tiered method of environmental review of HUD assisted projects exists, consisting of (1) normal environmental clearance; (2) special environmental clearance; and (3) environmental impact statement clearance. The normal environmental clearance consists of a "brief evaluation of environmental impact. Special clearance requires an environmental evaluation of greater detail and depth. Finally, an environmental impact statement is the complete and fully comprehensive environmental evaluation, including formal review by other federal, state and local agencies." HUD Handbook 1390.1, ¶ 5(a).

The Fifth Amendatory Application was a major amendatory within the meaning of HUD Handbook 1390.1, ¶ 2(f) which provides:

> *Major amendatory.* For the purposes of this Handbook, a significant change in the nature, magnitude or extent of the action from that which was originally evaluated and which may have a significant effect on the quality of the human environment, such as an environmentally significant change in location or site, area covered, size or design in which case they require environmental clearance. An increase or decrease in cost is considered a major amendatory only when the increase or decrease reflects such an environmentally significant change in the project.

Thus, an environmental clearance by HUD was required. HUD Handbook 1390.1, Appendix A–1.

HUD determined that the primary long-range effect of the project, by its nature, was to reverse and mitigate existing adverse environmental trends and conditions by replacing an obsolete and deteriorating retail-commercial area with a new one. The absence of any significant change in land use strongly supports the environmental clearance approved by HUD. See *Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa. 1978) which involved replacement of an old residential area with new residential structures. The absence of any significant change in land use clearly avoids the environmental impacts on air quality, water quality, wildlife, and noise such as are generated by dams, expressways, airports, or even new residential subdivisions. HUD's

finding that the primary adverse impacts were short-term and temporary, such as those effects occasioned by demolition and construction, was reasonable and is supported by the record. HUD also attested to its own efforts to verify the completeness and accuracy of the information provided in the application and in the 30 volumes of supporting materials and studies. Such efforts included site inspections, independent inquiries, consultation with the State Historic Preservation Officer, and clearance by state and local agencies. The Court holds that HUD's special environmental clearance and finding was proper and is sustained by the record. HUD's special environmental assessment procedure has been judicially recognized as an appropriate form of assessment. *Chick v. Hills*, 528 F.2d 445 (1st Cir. 1976); *Nucleus of Chicago Homeowners Association v. Lynn, supra.*

The Seventh Amendatory Application was also a major amendatory within the meaning of HUD Handbook 1390.1. This amendatory, which added a residential area to the project, has dubious relevance to the Hales Building issue. Therefore, without extended discussion, the Court holds in the alternative that (1) the Seventh Amendatory environmental clearance and finding is irrelevant to this action, or (2) the clearance, if relevant, was proper and is supported by the record.

The Third, Fourth and Sixth Amendatory Applications involved fund increases only and did not involve any change in the scope or nature of the project. The downtown project was reviewed for historical properties, through the A–95 process, at the time of each of these amendatories; but they did not require an environmental assessment or clearance, and in any event, had no possible effect on the Hales Building. The First, Second, and Eighth amendments to the Loan and Grant Contract did not involve applications at all and consisted merely of legal or technical modifications to the contract. Clearly, no environmental assessments or clearances were required with respect to these contract amendments, and likewise, they had no possible effect upon the Hales Building.

During the period relevant to HUD review and approval of the Fifth Amendatory Application, which added the area including the Hales Building for acquisition, the procedures for protection of properties prescribed by the Advisory Counsel on Historic Preservation provided as follows:

> IV. *Agency procedures*—1. *Consideration of Effect.* At the earliest stage of planning or consideration of a proposed undertaking, including master and regional planning, the Agency official shall: (a) consult the National Register to determine if a National Register property is involved in the undertaking; and (b) upon finding involvement, apply the 'Criteria for Effect.' Upon applying the criteria and finding no effect, the undertaking may proceed. Federal Register, Vol. 37, No. 220, Nov. 14, 1972.

Without question, the Hales Building had neither been listed on nor nominated to the National Register at that time. It appears from the record that HUD independently consulted both the National Register and the State Historic Preservation Officer prior to approval of the Fifth Amendatory.

Plaintiff COPA has also asserted that HUD was obligated to prepare an "inventory" or "survey" of structures in the project of historical significance in accordance with Executive Order No. 11593. Section 2(a) of Executive Order No. 11593 does require federal agencies to locate, inventory and nominate to the Secretary of the Interior all sites, buildings, districts and objects *under their jurisdiction or control* that appear to qualify for listing on the National Register of Historic Places. It is apparent from the text and language of the Executive Order that § 2(a) applies only to federally-owned or controlled properties. *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975). Plaintiff's argument in this respect is without merit.

The record establishes that HUD examined the National Register of Historic Places, consulted with the State Historic Preservation Officers, received and reviewed submissions from OCURA, funded

and reviewed detailed studies by professional third-party consultants, conducted its own independent inquiries and review, and arrived at its conclusions in compliance with the applicable legal guidelines. It is the Court's conclusion that HUD's environmental assessments and historic reviews for the downtown renewal project were reasonable and should be sustained.

The next issue posed is whether the unilateral determination of eligibility of the Hales Building for listing on the National Register by the Keeper on September 7, 1978, creates, in and of itself, an obligation to follow Advisory Council procedures for comment and review.

The authority of the Keeper of the National Register to issue such a determination unilaterally, without request of a Federal Agency or nomination of a property by a State Historic Preservation Officer, was created by amended U.S. Department of Interior Regulations, specifically 36 C.F.R. § 63.4(c) which became effective on September 21, 1977. Federal Register, Vol. 42, No. 183. Prior to September 21, 1977, the Keeper could neither act without request from a Federal Agency or State Historic Preservation Officer nor reverse the findings made by the Federal Agency and the State Historic Preservation Officer. See comments and supplementary information published in connection with the amended regulations, Federal Register, Vol. 42, No. 183, pp. 47662 and 47663.

Under these amended regulations, the only consequences arising from the Keeper's unilateral determination of eligibility are that written notice of the opinion will be given to the Federal Agency and the State Historic Preservation Officer, public notice of the property determined eligible will be published in the Federal Register, and the Keeper will *request* the State Historic Preservation Officer to nominate the property within six months. See 36 C.F.R. §§ 63.5 and 63.6. Prior to the conclusion of the planning and approval process with respect to a project, the publication would provide notice which must be taken into account, but the regulations contain no provision for further review, approval, or modification of the project where the opinion is issued subsequent to the project's approval and implementation.

From November 14, 1972, to January 25, 1974, Advisory Council procedures for the protection of historic and cultural properties, required a Federal Agency, at the earliest stage of planning or consideration of a proposed undertaking, to consult the National Register to determine if a National Register property is involved in the undertaking, and if there is no involvement or no effect by reason of such involvement, the undertaking may proceed. Federal Register, Vol. 37, No. 220, November 14, 1972. Pursuant to new regulations published January 25, 1974, and an amendment to the National Historic Preservation Act on September 28, 1976 (16 U.S.C. § 470f), the procedures were amended to require the Federal Agency, in addition to consulting the National Register, to consult with the appropriate State Historic Preservation Officer to determine if any properties within the area of the undertaking appear to meet the criteria for listing in the National Register of Historic Places, or to determine if it is questionable whether the criteria are met. If it is determined that there is eligibility or a question of eligibility, the Federal Agency is required to request an opinion from the Secretary of the Interior respecting the property's eligibility. If the Federal Agency determines that there is no such eligibility or question of eligibility, the Federal Agency may proceed. 36 C.F.R. § 800.-1, *et seq.* See specifically § 800.4; and see, 16 U.S.C. § 470f, as amended.

On the dates that the two environmental assessments and the various historic reviews were completed for this project, HUD acted in compliance with the procedures of the Advisory Council. On those occasions, examination of the National Register and consultation with the State Historic Preservation Officer revealed that the Hales Building was not listed on the Register and, under the amended procedures, was not eligible for listing on the Register. The appropriateness of HUD's actions must be

judged on the information available and the laws applicable at the times the actions were taken. The recent eligibility determination by the Keeper comes long after the planning and approval process has been concluded, and at a time when all significant HUD decisions for the project have been made.

It is observed that the Advisory Council regulations continue to provide that they are applicable "at the earliest stage of planning or consideration of a proposed undertaking . . . ," 36 C.F.R. § 800.4, and that these regulations have not been amended to require additional reviews or actions by the Federal Agency as a result of a unilateral eligibility determination by the Keeper where the Agency's responsibilities have been previously discharged in a proper manner.

Neither the revised Interior regulations for the Keeper, nor the Advisory Council regulations create or impose a new or further obligation to follow the Advisory Council procedures for comment and review with regard to the Hales Building.

The third principal issue for consideration is: Whether a new assessment is required at this time.

Evidence and testimony at the hearing included evidence regarding the current status of the redevelopment project. The project is being carried out by OCURA pursuant to the Urban Redevelopment Law of Oklahoma. 11 Okla.Stat. § 1601, *et seq.* The relationship between OCURA and HUD is entirely contractual and is established by the Loan and Grant Contract and amendments thereto.

In accordance with the approved Central Business District Urban Renewal Plan, which is funded by the Loan and Grant Contract, the acquisition of all 59 parcels in the development site has been completed. All planned relocation of business and individuals have been completed. HUD concurred in the form of demolition contract documents on November 6, 1974. OCURA approved the award of the demolition contract for the remaining structures in the site, including the Hales Building. On August 16, 1978. On August 23, 1978, HUD determined that the demolition contractor, Tompkins & Co., was not on the list of debarred contractors, and on September 7, 1978, found the contractor's affirmative action plan acceptable under applicable requirements.

With respect to redevelopment of the four-block Galleria area, on April 23, 1976, HUD concurred in the land disposition price for the redevelopment site. On February 6, 1978, this project site was properly certified to HUD as a redevelopment area under the Public Works and Economic Development Act of 1965 by the United States Department of Commerce, which certification is required to invoke the provisions of § 113 of the Housing Act of 1949, as amended, and the provisions of § 106(k) of the Loan and Grant Contract for this project. On February 22, 1978, the Board of Commissioners of OCURA approved the assignment of a previously awarded redevelopment contract for the site to the Oklahoma City Redevelopment Corporation, an eligible nonprofit corporation, pursuant to § 113 of the Housing Act of 1949 as amended. On July 18, 1978, HUD concurred in the assignment of the Redevelopment Contract.

In response to published invitations for submission of further redevelopment proposals, four proposals were received by the Board of Commissioners of OCURA on March 31, 1978. On April 26, 1978, Carrozza Investments, a limited partnership, was designated as the developer subject to negotiations of a satisfactory definitive contract. Since this contract will be entered into with the Oklahoma City Redevelopment Corporation, no further concurrence or approval of any kind by HUD is required.

At this point in time, HUD's authority under the terms of the Loan and Grant Contract for the project, as amended, is limited to its right to insist on compliance with the provisions of the contract. Even the routine, ministerial, and perfunctory clearances and approvals required under the contract and HUD procedures with respect to the redevelopment site in which the Hales Building is located have all taken place.

These concurrences and approvals occurred *prior* to notification of HUD by the Keeper of the National Register of his opinion.

It is the position of Plaintiff COPA that a new environmental assessment must now be made for the project inasmuch as the Keeper of the National Register has determined that the Hales Building is eligible for listing. Plaintiff further asserts that this assessment process would then require submission of the Hales Building issue to the Advisory Council for review and comment.

Since this Court has held that the applicable laws and regulations for historic and environmental assessments have been previously complied with in a timely and proper manner, the issue posed is at least unusual, if not unique. Where a proper assessment has been performed, does there arise a subsequent retrospective duty to perform a new assessment? No cases have been found which support the argument of such a duty.

With only one exception,[5] the numerous cases cited by Plaintiff and Defendants dealing with historic properties involve projects for which there had *never* been a review under historic and environmental assessment procedures.

Cases cited by the Defendants hold that environmental assessments will not be required where there is no remaining significant action to be taken by the Federal Agency. *Olivares v. Martin,* 555 F.2d 1192 (5th Cir. 1977); *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973); *Sworob v. Harris, supra; Marin City Council v. Marin County Redevelopment Agency,* 416 F.Supp. 700 (N.D.Calif.1975).

On the other hand, in the cases cited by the Plaintiff, the courts have concluded that assessments were necessary in the renewal projects under consideration. Examination of these cases reveals that in each the court determined that some significant action remained to be performed by HUD. In *Boston Waterfront Residents Association, Inc. v. Romney,* 343 F.Supp. 89 (D.Mass.1972), the Court emphasized that "particular parts of the project are still planned for the future" and "there is still time and opportunity for the consideration of alternatives." 343 F.Supp. 89 at 91. *Save the Courthouse v. Lynn, supra,* involved, *inter alia,* HUD's admitted failure to make a required environmental assessment for a major amendatory specifically affecting the historic property. In *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973), the court made it very clear that the required assessment would relate only to "the *uncompleted* part of the project" and would not apply to parcels where "there is no continuing or likely federal involvement." 477 F.2d 885 at 893. In *Hart v. Denver,* 551 F.2d 1178 (10th Cir. 1977), the original Loan and Grant Contract was signed in 1968 and the historic D & F Tower was added to the National Register in 1969. Subsequent to this date, virtually all of the activity with regard to the Tower occurred; the site was purchased, site disposition was approved, and three separate redevelopment contracts were executed (the two earlier purchasers defaulting). The court pointed out that no environmental clearance had ever been made, and that numerous agency decisions remained after the property was placed on the National Register.

Implicit in the holdings under both lines of authority is the obligation to perform assessments "for uncompleted projects which have never gone through an environmental clearance. . . ." HUD Handbook 1390.1, ¶ 5a(4). Since the assessments for such uncompleted projects are to occur at the time of "a subsequent significant HUD action . . ." (HUD Handbook 1390.1, ¶ 5a(4)), the differences in view arise over the question of the degree of significance of the remaining HUD actions.

Relying on the cases which determine that the remaining HUD actions were "significant," the Plaintiff contends that the provisions of the Loan and Grant Contract

5. *Warm Springs Dam Task Force v. Gribble,* 378 F.Supp. 240 (N.D.Cal.1974), involved the failure to complete further procedures pursuant to § 2(b) of Executive Order 11593 (applicable to federal properties) arising as a result of Interior's comment on the environmental assessment.

concerning conditions for future progress grant payments (see § 201 of the contract) and the provisions authorizing HUD to require certain information and approvals prior to proceeding (§ 108 of the contract) provide a basis for HUD to re-enter the project to make a new assessment. Under Section 201, HUD may elect not to make certain loan or grant payments in the event of noncompliance by OCURA with certain enumerated provisions. However, upon presentation of evidence of entitlement to payment, HUD must make such payments unless the recipient is not acting in compliance with the terms of the contract.

Under § 108 of the contract, if HUD requests and OCURA furnishes certain documentary data, HUD may elect not to make a requested payment if OCURA shall have proceeded further with respect to such matters without having been advised in writing that HUD has no objection to proceeding. Section 108 provides in part:

> . . . it being the purpose of this subsection, and of subsection (A) of this Section, to insure that the local public agency shall not take any step which might, in the opinion of the secretary, violate applicable Federal laws or regulations or provisions of this Contract, and to minimize thereby the possibility of violations which might render it impossible for the Government to make the Project Temporary Loan or any Project Definitive Loan or to pay the Project Capital Grant as the case may be, or which might result in unnecessary and ineligible costs, or unnecessary delays with respect to the Project.

It appears to the Court that Section 108 is a monitoring or pre-audit provision, to the extent HUD requests the documentary data authorized prior to proceeding, to assure compliance with the terms of the contract and applicable federal laws. Thus, consideration of Section 108 merely returns us to the question whether applicable federal law has been complied with.

The cited cases address the question whether any remaining HUD actions are sufficiently significant to trigger the preexisting duty to perform an assessment where an assessment has never been performed. In essence, the line of authority cited by Plaintiff stands for the proposition that if a duty exists, the failure to perform that duty keeps the obligation alive. Correspondingly, performance of the duty (in a proper manner) extinguishes the obligation. Thus, the differences in rationale found in the two lines of authority are academic in this case.

The assertion of duty to perform a new assessment at this time is contrary to the express terms of NHPA. This Act provides that it shall apply "*prior to the approval* of the expenditure of any Federal funds on the undertaking. . . ." 16 U.S.C. § 470f. HUD complied with the provisions of this Act on the dates of approvals for this project. Consequently, no further action remains to be taken under this Act. *South Hill Neighborhood Association, Inc. v. Romney*, 421 F.2d 454 (6th Cir. 1969), cert. den. 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970); *Kent County Council for Historic Preservation v. Romney*, 304 F.Supp. 885 (W.D.Mich.1969); *St. Joseph Historical Society v. Land Clearance for Redevelopment Authority*, 366 F.Supp. 605 (W.D.Mo.1973).

The provisions of NEPA and the applicable implementing regulations do not require reassessment of that which has been properly assessed. The applicable regulation implementing NEPA and concerning retroactive application provides:

> *Retroactivity.* To the maximum extent practicable, environmental clearance shall be required for uncompleted projects which have never gone through an environmental clearance under NEPA, at such time as a subsequent significant HUD action, such as the next stage of program approval or approval of a major amendatory, is proposed. Where it is not practicable to reassess the basic course of action, major attention should be given to measures, which, given the stage of project completion, may reduce adverse environmental impact. It is also important in taking further action that account

be taken of environmental consequences not fully evaluated at the outset of the project. HUD Handbook 1390.1, ¶ 5a(4).

It is apparent from the quoted language that it is not applicable to projects which have been subject to a proper environmental clearance under NEPA. The duty to perform assessments retroactively applies *only to uncompleted projects which have never undergone a NEPA clearance.*

Finally, there is inherent in the Plaintiff's argument the suggestion that the recent opinion by the Keeper of the National Register demonstrates that the earlier assessments by the Defendants were somehow incomplete or improper. This Court finds that the historic and environmental consequences of the project were fully evaluated as required by laws and regulations in effect at the time. In fact, as discussed earlier in this opinion, both the applicable legal standards and the authority of the Keeper of the National Register to issue determinations of eligibility have subsequently changed. The substantive and procedural propriety of the earlier assessments and clearances are to be judged on the basis of information available and regulations in effect at the time they were performed.

In the present case, the challenged activities have undergone the required assessments under NEPA and all required HUD approvals regarding actions in the development site have been granted.

This Court, therefore, holds that there is no basis for intrusion into the contractual relationship between HUD and OCURA and that there are no major or minor decisions, involving any element of discretion, that remain to be performed by HUD in connection with the development site in which the Hales Building is located. The record supports HUD's determinations and approvals with regard to the Hales Building, and there are no laws or regulations which impose a duty on HUD to undertake a new retrospective assessment or historic review where prior assessments and reviews have been completed in a timely and proper manner.

The application of Plaintiff for preliminary and permanent injunctive relief is denied, and judgment is hereby entered for the Defendants.